**Shpetim HOXHA, Petitioner,**

v.

**John ASHCROFT, Attorney General, Respondent.**

No. 01–71636.

United States Court of Appeals, Ninth Circuit.

Argued and Submitted Nov. 5, 2002.

Filed Feb. 18, 2003.

**1180**

Curtis F. Pierce, Los Angeles, CA, for the petitioner.

Norah Ascoli Schwarz, Michele Y.F. Sarko, United States Department of Justice, Civil Division, Office of Immigration Litigation, Washington, DC, for the respondent.

Before CANBY, GOULD and BERZON, Circuit Judges.

CANBY, Circuit Judge:

Petitioner Shpetim Hoxha, an ethnic Albanian male from what used to be the Kosovo region of Serbia,[1] entered this country as a student and overstayed his visa. In deportation proceedings he applied for asylum, 8 U.S.C. § 1158, and withholding of deportation, 8 U.S.C. § 1231(b)(3), but the Board of Immigration Appeals ("BIA") held that he was not eligible for either. Hoxha petitions for review. We conclude that substantial evidence does not support the BIA's denial of eligibility for asylum but does support the denial of withholding of deportation. We accordingly grant the petition for review, reverse the decision of the BIA holding Hoxha ineligible for asylum, and remand to the BIA so that it may exercise its discretion whether to grant asylum.[2]

I

Ethnic Albanians make up about ninety percent of Kosovo's population of two million people, but, at the time of Hoxha's asylum hearing in February 1999, they were still a minority within Serbia as a whole. Because many Serbs, as well as the Serbian government, considered Kosovo to be a traditional part of Serbia, the existence of a substantial Albanian population sparked widespread violence and bloodshed between Albanians seeking independence from the Serbian-dominated government and a Serbian civilian and mil-

---

**1.** In mid–1999, Kosovo was made a United Nations protectorate. Kosovars elected a new assembly in 2001 and chose a president in 2002. Serbia is now part of the state of Serbia and Montenegro. *See* United States Dep't of State, *Background Note: Federal Republic of Yugoslavia* (Aug. 2002), *available at* http://www.state.gov/r/pa/ei/bgn/5388.htm;

Daniel Simpson, Yugoslavia Is Again Reinvented, in Name and Structure, N.Y. Times, Feb. 5, 2003, at A3.

**2.** Because we hold that Hoxha has a well-founded fear of future persecution, we need not address Hoxha's due process claims.

itary leadership bent on asserting its political and ethnic dominance over the region.

Hoxha's case reflected these realities. At his deportation hearing in February 1999, Hoxha testified about past mistreatment that he and other ethnic Albanians routinely received at the hands of Serbs. Hoxha testified that he had been subjected to harassment, threats and mistreatment since early childhood. He testified that he was repeatedly told to leave the country because it belonged to the Serbs and that he would be harmed or killed if he chose to stay. Hoxha testified that, on one occasion, he and a friend were set upon and beaten by a group of Serbs who overheard them speaking Albanian. Hoxha was treated for extensive facial bruises and two broken ribs. He testified that he did not report the incident to the police because he believed that the police would not take action to stop violence against ethnic Albanians.

While in the United States in 1998, Hoxha received a summons from the Serbian government to report for an "informative conversation," with no reason stated. Hoxha did not respond to the summons. Ilir Zymberi, a longtime friend of Hoxha who is also ethnic Albanian, testified that he received a similar summons, but that nothing out of the ordinary occurred when he responded in person.

Hoxha further testified that his father was a member of an opposition political party, but that his own political activity was limited to translating signs from Albanian into English for a planned demonstration that never took place.

Hoxha stated that he feared persecution should he return to Kosovo. He testified that adults of his age—he is in his early twenties—are particularly prone to abuse and stated that because he is an ethnic Albanian, he thought he would likely be killed should he return to the region. He submitted substantial documentary evidence detailing the various and extensive human rights violations committed against ethnic Albanians in Kosovo.

The Immigration Judge ("IJ") found Hoxha's testimony credible, but ruled that the lifetime of insults and one-time beating Hoxha experienced did not amount to past persecution, and that Hoxha had not established a well-founded fear of future persecution. In finding Hoxha's fear unfounded, the IJ noted that Hoxha's family has continued to live in Kosovo and has not experienced any mistreatment. Because Hoxha was found ineligible for asylum, he also failed to meet the higher standard required for withholding of deportation.

Hoxha appealed to the BIA. The BIA affirmed the IJ's decision and also found that the evidence presented by Hoxha did not demonstrate a pattern or practice of persecution.[3] Hoxha then filed a timely petition for review with this court.

## II

To be eligible for a discretionary grant of asylum, Hoxha must demonstrate that he is unwilling to return to Kosovo "because of persecution or a well-founded fear of persecution on account of race, religion, nationality, membership in a particular group, or political opinion."[4] 8 U.S.C.

---

**3.** Because the BIA conducted a de novo review of the IJ's decision, we review only the BIA's decision and not the decision of the IJ. *See Duarte de Guinac v. INS,* 179 F.3d 1156, 1160 (9th Cir.1999).

**4.** We must uphold the BIA's determination that Hoxha is ineligible for asylum if it is

supported by substantial evidence. *See INS v. Elias–Zacarias,* 502 U.S. 478, 481, 112 S.Ct. 812, 117 L.Ed.2d 38 (1992). We may reverse only if the evidence is so clear that a reasonable factfinder would be compelled to conclude that Hoxha has a well-founded fear of persecution. *See id.*

§ 1101(a)(42). Persecution because of his ethnicity as an Albanian can qualify. *See Duarte de Guinac v. INS,* 179 F.3d 1156, 1160 n. 5 (9th Cir.1999).

### A. *Past persecution*

 Substantial evidence supports the BIA's finding that Hoxha had not suffered past persecution, which would have raised a rebuttable presumption of a well-founded fear of future persecution. *See Avetova–Elisseva v. INS,* 213 F.3d 1192, 1197 (9th Cir.2000). Persecution is "the infliction of suffering or harm upon those who differ (in race, religion, or political opinion) in a way regarded as offensive." *Desir v. Ilchert,* 840 F.2d 723, 727 (9th Cir.1988) (quoting *Kovac v. INS,* 407 F.2d 102, 107 (9th Cir.1969)). Although Hoxha's experiences are disturbing and regrettable, they do not evince actions so severe as to compel a finding of past persecution. The unfulfilled threats by various Serbs against Hoxha constitute harassment rather than persecution. *See Lim v. INS,* 224 F.3d 929, 936 (9th Cir.2000) ("Threats themselves are sometimes hollow and, while uniformly unpleasant, often do not effect significant actual suffering or harm."). The one incident of physical violence against Hoxha was not connected with any particular threat and there is no evidence indicating that the incident was officially sponsored.[5] There is no evidence that the attackers knew who Hoxha was or that they showed any continuing interest in him; Hoxha lived in Kosovo for another six months following the attack without experiencing any additional harm. *See id.* (considering the fact that the petitioner stayed in his native country after the attack without experiencing any future mistreatment in denying petitioner's asylum claim); *Lata v. INS,* 204 F.3d 1241, 1245

(9th Cir.2000) (same); *see also Kamla Prasad v. INS,* 47 F.3d 336, 339 (9th Cir. 1995) (single incident of detention and beating did not compel finding of persecution). Hoxha, therefore, failed to present evidence compelling a finding of past persecution, and the BIA accordingly was not required to give Hoxha the benefit of a rebuttable presumption that his fears of future persecution were well founded.

### B. *Well-founded fear of future persecution*

Hoxha may establish a well-founded fear of future persecution without the benefit of a presumption, however, and we conclude that he has done so by evidence that compels a finding in his favor.

 In order to render Hoxha eligible for asylum, his fear of persecution must be both "subjectively [genuine] and objectively reasonable." *Arriaga–Barrientos v. INS,* 925 F.2d 1177, 1178 (9th Cir.1991). The parties agree that Hoxha met the subjective requirement by testifying credibly as to his fear of persecution. *See id.* The disputed issue is whether he provided evidence that compels a finding that his fear was objectively reasonable.

 On this question, the general level of mistreatment of ethnic Albanians by the dominant Serbian majority set forth in the record helps to support Hoxha's position. Although Hoxha's fear must be based on an individualized rather than generalized risk of persecution, the level of individualized targeting that he must show is inversely related to the degree of persecution directed toward ethnic Albanians generally. *See Kotasz v. INS,* 31 F.3d 847, 852–54 (9th Cir.1994). "[T]he more egregious the showing of group per-

---

**5.** Physical violence ordinarily meets the requirement of severity that characterizes persecution as opposed to mere discrimination.

*See, e.g., Duarte,* 179 F.3d at 1161 ("we have consistently found persecution where, as here, the petitioner was physically harmed").

secution—the greater the risk to all members of the group—the less evidence of individualized persecution must be adduced," because of the increased likelihood that the applicant will face persecution simply on account of his or her membership in the group.[6] *Id.* at 853. Thus, the determination whether Hoxha has a reasonable fear of future persecution depends on both Hoxha's own personal experience and the degree of persecution that faced ethnic Albanians generally.

■ The record evidence presented by Hoxha would compel any reasonable factfinder to conclude that his fear of future persecution was objectively reasonable at the time of his hearing in February 1999. The record provides a lengthy and grisly documentation of the numerous atrocities committed against ethnic Albanians. The 1997 State Department Profile of Asylum Claims and Country Conditions for Serbia—Montenegro notes that ethnic Albanians were subject to vigilantism, human rights abuses, discrimination, and shooting and bombing incidents. Furthermore, of all the areas in Serbia Montenegro, the worst abuses occurred, and greatest risk existed, in Kosovo. Other evidence submitted by Hoxha identifies systematic oppression and flagrant violation of basic rights, as well as numerous cases in which ethnic Albanians were threatened, arrested and beaten. Also in the record are media reports indicating the United States government's displeasure with the Serbian policy of "shelling villages, burning houses, and murdering innocent men, women, and children." This statement by the American government is corroborated by reports of indiscriminate and bloody massacres of

Kosovar villages on at least two separate occasions, resulting in the slaughter of scores of ethnic Albanians, including women and children. The United Nations General Assembly passed a resolution decrying numerous human rights abuses against ethnic Albanians, including torture, cruel, inhuman and degrading treatment, arbitrary searches and detention, and wanton killing and destruction. Finally, the 1997 U.S. State Department Report on Human Rights Practices in Serbia–Montenegro identifies numerous abuses suffered by ethnic Albanians. Specifically the report details that ethnic Albanians were subject to torture and arbitrary detention, that many were driven from their homes and fired from their jobs, that the police did not investigate or rein in those who committed violence against ethnic Albanians, and that the Albanians were subject to discrimination and violations of their civil rights. Although many of the atrocities are directed specifically at protestors and opposition groups, the evidence also reflects that discrimination occurred across the board and that non-activist ethnic Albanians were not spared from state-sponsored violence. Thus, the record evidence, none of which is disputed by the government, paints a grim picture of the hardship and risks faced by all ethnic Albanians who remained in Kosovo.

Because the record reveals that the amount of persecution directed toward Albanians generally is extensive, the level of individualized risk Hoxha must show in order to establish a well-founded fear of future persecution is comparatively low. *See Mgoian v. INS,* 184 F.3d 1029, 1035 n.

**6.** In extreme cases where persecution is so widespread as to constitute a "pattern or practice of persecution" against a particular group, the group member need not show an individualized targeting in order to qualify for asylum. *See* 8 C.F.R. § 208.13(b)(2)(iii); *Kotasz,* 31 F.3d at 852. Because we conclude that Hoxha has produced evidence compelling a finding of a well-founded fear of future persecution even in the absence of a "pattern or practice," we need not address the BIA's finding that no pattern or practice had been shown.

4 (9th Cir.1999); *Kotasz,* 31 F.3d at 853. Hoxha has demonstrated sufficient particularized risk to compel a finding in his favor. First, the threats and violence Hoxha experienced, although not sufficient to compel a finding of past persecution that would create a presumption in his favor, are indicative of his individualized risk of experiencing similar mistreatment if he returns to Kosovo. *See Gui v. INS,* 280 F.3d 1217, 1229 (9th Cir.2002) (noting that threats, while not constituting past persecution, are "evidence probative of the reasonableness of a fear of future persecution").

Moreover, the fact that Hoxha received, and ignored, a summons for an "informative conversation" with Serbian authorities also demonstrates an individualized risk of persecution. The INS contends that the summons does not place Hoxha at risk because the subject matter of the summons is unknown, the other witness at Hoxha's asylum hearing responded to a similar summons without incident, and there is no evidence that Hoxha would still have to respond to the summons after the passage of several years. A Human Rights Watch report submitted as part of the record states, however, that those who report for "informative talks" with the police sometimes end up being beaten and detained. A well-founded fear does not require certainty of persecution or even a probability of persecution. *See INS v. Cardoza–Fonseca,* 480 U.S. 421, 431, 107 S.Ct. 1207, 94 L.Ed.2d 434 (1987). The summons does indicate that the government was interested in Hoxha himself, and such interest sometimes leads to beatings and detention. These facts add to the objective reasonableness of Hoxha's fear.

The government presents several arguments in which it attempts to show that Hoxha's risk of future persecution is minimal. First, the government notes that despite Hoxha's asserted risk, his family has remained in Kosovo without suffering any mistreatment. Although the government is correct that this fact ordinarily diminishes the petitioner's risk of future persecution, *see, e.g., Lim,* 224 F.3d at 935, evidence of the condition of the applicant's family is relevant only when the family is similarly situated to the applicant. *See id.* Hoxha has demonstrated that he is not similarly situated because he has been previously victimized by Serbian vigilantes, and because he has been summoned by the Serbian authorities.

Second, the government suggests that Hoxha's fear of future persecution is unreasonable because he obtained a passport to travel to the United States; if the Serbian government truly wanted to persecute Hoxha, it would not have let him escape to a foreign country. *See, e.g., Espinoza–Martinez v. INS,* 754 F.2d 1536, 1540 (9th Cir.1985). Ethnic Albanians, however, suffered persecution because many Serbs believed that the Albanians did not belong in Kosovo and wanted them to leave; the Serbian authorities actively supported an Albanian exodus instead of opposing it. *See State Dep't Country Conditions Report, 1997,* (noting that Serbian authorities issued passports to ethnic Albanians without difficulty, "presumably to encourage their emigration"); *see also Avetova–Elisseva,* 213 F.3d at 1200 (minimizing the significance of the Russian government's issuance of a passport to the petitioner). Thus, the fact that Hoxha received a passport does not alter our conclusion that Hoxha has presented evidence that compels a finding that he entertains a well-founded fear of persecution.

## III

■ Although the BIA erred in holding that Hoxha was not eligible for asylum, it did not err in ruling that he failed to qualify for mandatory withholding of de-

portation. To qualify for mandatory withholding, Hoxha was required to show a clear probability—i.e. that it is more probable than not—that he would suffer future persecution. *Lim*, 224 F.3d at 937–38.

Although the evidence of abuse against ethnic Albanians is extensive, and although Hoxha has demonstrated that he has an appreciably higher risk of persecution than other Albanians, the evidence does not compel a finding that it is more probable than not that he would be persecuted upon return to Kosovo. Much of the persecution outlined in the record was directed toward members of the political opposition, and Hoxha does not have a history of political agitation other than the one time he translated signs for a political rally that never took place. It is not apparent that the persecution of non-political Albanians is so widespread that Hoxha faces a clear probability of persecution should he return. *See e.g., id.* (finding the petitioner eligible for asylum but not entitled to mandatory withholding). On this record, we cannot conclude that the evidence compels a finding of a clear probability of future persecution.

### IV

Hoxha's success on this appeal is therefore limited to his having established his eligibility for asylum. The fact that he is eligible does not automatically entitle him to asylum, however; it remains within the discretion of the Attorney General whether to grant that relief. *See* 8 U.S.C. § 1158(b)(1) (providing that the Attorney General "may grant asylum" to an individ-

ual determined to be a refugee within the meaning of 8 U.S.C. § 1101(a)(42)(A)); *INS v. Ventura*, —— U.S. ——, 123 S.Ct. 353, 353–54, 154 L.Ed.2d 272 (2002). Accordingly, we grant the petition for review, reverse the decision of the BIA, and remand to the BIA so that it can exercise the Attorney General's delegated discretion whether to grant Hoxha asylum.

In remanding to the BIA, we note that political and social conditions in Kosovo have changed in the four years that have passed since Hoxha first applied for asylum, as a result of the NATO bombing effort and the removal and arrest of former Serbian President Slobodan Milosevic. While we do not express any opinion on the relevance of changed conditions, the BIA may want to consider in appropriate proceedings any such changes in deciding how to exercise its discretion.[7] *See Ventura*, 123 S.Ct. at 356 (holding that evidence concerning changed country conditions should be considered initially by the agency).

**PETITION FOR REVIEW GRANTED; REVERSED AND REMANDED.**

---

7. In identifying possible changes to country conditions in Kosovo, our remand does not, and indeed cannot, ask the BIA to determine whether changed country conditions have eliminated Hoxha's well-founded fear of future persecution. *See Avetova–Elisseva*, 213 F.3d at 1198 n. 9 (noting that constant remands to the BIA to consider the impact of changed country conditions occurring during

the period of litigation of an asylum case would create a "Zeno's Paradox" where final resolution would never be reached). We have already determined that Hoxha has a well-founded fear of persecution. We note only that the BIA may wish to consider changed conditions in exercising its discretionary authority.